## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| Boardwell, LLC | |
| *Plaintiff,* | Case No. 1:25-cv-01190 |
| v. | |
| Monexaba.vip, *et al.,* | **Plaintiff's Renewed Motion for *Ex Parte* Temporary Restraining Order & Order Authorizing Expedited Discovery** |
| *Defendants.* | |

Plaintiff Boardwell, LLC hereby renews its request that the Court enter (i) a temporary restraining order freezing the Defendants' assets and (ii) an order authorizing Plaintiff to engage in expedited discovery. In support, Plaintiff respectfully shows the Court as follows.

### I.    Preliminary Statement

As the Court will be aware, this case arises from what is known as a "pig-butchering scam." Boardwell, LLC ("Boardwell") filed this action to recover assets lost to a cryptocurrency-related fraud and conversion scheme operated by a sophisticated criminal syndicate. The Defendants stole assets worth more than $633,000.00 from the Victim, who subsequently assigned her claims to Boardwell. This was a devastating loss. As is typical in these cases, Boardwell does not know the Defendants' true identities or their

- 1 -

precise whereabouts. But, with the assistance of a professional blockchain investigator, Boardwell has traced the stolen assets to accounts controlled by the Defendants at two cryptocurrency exchanges. This tracing is fundamental to the relief Boardwell seeks in this Motion.

Boardwell's present aims are to preserve the status quo and serve the Defendants with process. Accordingly, Boardwell now seeks (i) an *ex parte* temporary restraining order freezing the Defendants' assets and (ii) authorization to issue subpoenas to various third parties seeking information about the Defendants and their activities.

The Court previously denied Plaintiff's request for the relief without prejudice.[1] This renewed motion addresses the concerns raised in the Court's Order by providing much more detail about (i) the pig-butchering "scamdemic," (ii) blockchain tracing and the acute risks of irreparable harm in crypto-fraud cases like this one, and (iii) the particulars of the Defendants' scam. In addition, the declarations offered in support of this renewed motion verify the facts in the Complaint and attach relevant documentary evidence.

## II.    Supporting Materials

Boardwell submits the following materials in support of this Motion.

---

[1] Dkt. 8.

### A.    Cole Affidavit

Evan Cole is Boardwell's investigator in this case. Mr. Cole's affidavit is much expanded in support of this renewed motion. It proceeds in three parts, as follows.

*The Pig-Butchering "Scamdemic."*  Mr. Cole's affidavit first provides background about the pig-butchering "scamdemic" to which Americans are losing billions each year. In so doing, he relies on his deep experience investigating pig-butchering cases and the FBI's most recent cybercrime report, which shows that *more than forty thousand* Americans reported more than *$5.8 billion* in losses to pig-butchering scams in 2024 alone.[2]

*The Monexaba.vip Scam.* Next, Mr. Cole's affidavit explains why there is no doubt that the Defendants are the perpetrators of a pig-butchering scam. It does so by verifying the facts in the Complaint—by virtue of Mr. Cole's personal review of the documentary evidence and interviews with the Victim in this matter—and trenchantly comparing those facts with the scam "typology" set out in the most comprehensive academic study of pig-butchering scams to date. Mr. Cole's affidavit also attaches and verifies probative documentary evidence, including (i) a screen capture of the fraudulent Monexaba.vip platform and (ii) a screen capture showing a warning from the *real* Monex Group revealing the existence of fraudulent

---

[2] Ex. 1, Declaration of Evan Cole ("Cole Dec."), ¶¶ 3 – 7 (describing pig-butchering scamdemic); Ex. 1-A, FEDERAL BUREAU OF INVESTIGATION INTERNET CRIME COMPLAINT CENTER, *2024 Internet Crime Report*, p. 36.

Monex impersonation platforms like the Defendants' here, and (iii) a declaration from an additional victim of the Monex scam.

*Investigation.* Mr. Cole's affidavit next attests to the investigative findings that are fundamental to the relief that Boardwell seeks here. It does so, first, by providing a plain-English description of the blockchain tracing Mr. Cole has performed, tracing the path of the assets the Defendants misappropriated from the Victim and attesting to those assets' ultimate destinations at two of the world's largest cryptocurrency exchanges. Mr. Cole attaches a blockchain tracing report and a visualization documenting and illustrating these asset flows. Mr. Cole's affidavit then explains the acute risk of irreparable harm in cryptocurrency-related cases. Finally, it details the open-source intelligence investigation conducted to date and the third-party subpoena targets already identified.

### B.    Hoda Affidavit

Marshal Hoda is counsel to Boardwell in this matter. Mr. Hoda's affidavit attests to the reasons why the Court should not require notice before issuance of an *ex parte* temporary restraining order and verifies the allegations set out in Boardwell's Complaint by reference to his personal review of the pertinent evidentiary materials.

### III.    Factual Allegations

This section first provides necessary background about the crypto-fraud epidemic. It then explains salient aspects of blockchain technology and

tracing methodology. Finally, it summarizes the facts of this case and details the tracing of the assets the Defendants stole from the Victim.

### A.    The Pig-Butchering Scamdemic

This case arises from what is known as a "pig-butchering scam." In such scams, the perpetrators convince the victim to 'trade' in cryptocurrencies using a fake-but-realistic-looking online platform that the perpetrators control.[3] But no 'trading' ever occurs.[4] The perpetrators simply steal the victim's money, then disappear into cyberspace.[5] The hallmarks of these scams are so consistent and distinctive that experienced investigators can positively identify a pig-butchering scam in a five-minute victim interview.

Pig-butchering scams are epidemic. Last year, the FBI received 41,557 reports of cryptocurrency-related investment fraud.[6] These victims collectively reported *$5.8 billion* in losses in 2024 alone.[7] The FBI has reported a 29% increase in pig-butchering victim complaints and a 47% increase in losses from 2023 to 2024.[8] Law-enforcement resources have been

---

[3] Cole Dec., ¶¶ 8 – 20 (describing pig-butchering scams based on professional experience and attaching comprehensive academic study).

[4] *Id.*

[5] *Id.*

[6] *Id.* at ¶¶ 5 – 7 (describing scope and scale of pig-butchering scamdemic and attaching FBI cybercrime report); Ex. 1-A, FEDERAL BUREAU OF INVESTIGATION INTERNET CRIME COMPLAINT CENTER, *2024 Internet Crime Report*, p. 36.

[7] *Id.*

[8] *Id.*

overwhelmed by the scale of this epidemic, such that most victims receive no response to their law-enforcement reports.[9]

Pig-butchering syndicates' mechanics are well known. The largest pig-butchering organizations are based in Southeast Asia, where this type of scam originated.[10] They are managed at the highest level by professional criminals, who use forced labor to fill their operations' rank-and-file.[11] These 'agents' are trained in social-engineering and psychological-manipulation techniques, which they use to deceive and steal from the syndicates' victims.[12]

The criminal bosses who orchestrate these scams have become fantastically rich by stealing from Americans.[13] These foreign criminals specifically target American victims and relish the opportunity to steal from them.[14] Some escaped former scam "workers" have reported, for instance, that their bosses urged them to "cripple the U.S. economy," and to conceive of their campaign against U.S. citizens as "World War III."[15]

---

[9] *Id.*

[10] *Id.* at ¶ 6.

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

### B.     The Monexaba.vip Scam

As detailed in Boardwell's Complaint,[16] the Defendants' scheme bears the unmistakable characteristics of a pig-butchering scam. Defendant Ron Wilson contacted the victim ("Victim") through a dating site and gained her trust by patiently building a personal connection.[17] He then advised her to make an account on the monexaba.vip platform, and "trained" her in the process of trading and investing in cryptocurrencies there.[18] Following Wilson's guidance, Victim began transferring cryptocurrency she had purchased to blockchain addresses provided to her by monexaba.vip—which she believed to be a legitimate trading platform.[19]

But when Victim attempted to withdraw her funds, Monexaba's representatives told her that because the amount of the withdrawal was significant, she needed to pay withdrawal fees to the platform, taxes, and a technology fee to process the withdrawal.[20] To this day, the Monexaba scammers have not returned any of the assets that Victim send to Monexaba to either Boardwell or Victim, despite repeated demands.

---

[16] Dkt. No. 1, ("Complaint").

[17] *Id.*, ¶ 14.

[18] *Id.*, ¶¶ 15-16.

[19] *Id.*, ¶¶ 16-18.

[20] *Id.*, ¶ 18.

The cryptocurrencies Victim transferred to the Defendants were never 'invested' or used for any other legitimate purpose.[21] The Defendants simply stole Victim's assets. They are absconding with those assets by transferring them from address to address on the blockchain.[22]

Mr. Cole's declaration explains why there is no doubt that the defendants are a criminal pig-butchering scam syndicate. It does so (i) by verifying the allegations in the Complaint, by virtue of Mr. Cole's personal review of the documentary evidence and interviews with the Victim in this matter, and (ii) trenchantly comparing those facts with the scam "typology" set out in the most comprehensive academic study of pig-butchering scams to date. Mr. Cole also attaches and verifies probative documentary evidence, including (i) a screen capture of the fraudulent Monex platform and (ii) a screen capture showing a warning from the *real* Monex Group revealing the existence of fraudulent Monex impersonation platforms like Monexaba.vip.

## C.    Additional Monex Victim

An additional Monex victim recently learned about this case through independent online research and contacted the undersigned counsel. This

---

[21] Ex. 1, Cole Declaration (henceforth "Cole Dec."), ¶¶ 3-5 (concluding that Victim was the victim of a pig-butchering scam and providing sources for comparison to facts of this case).

[22] *Id.*

victim, Donna Pomeroy, has provided evidence and a declaration. Ms. Pomeroy's declaration is provided as an attachment to Mr. Cole's affidavit.[23]

This declaration shows that Ms. Pomeroy's experience is an *exact match* to both the experience of the Victim in this case and to the distinctive pig-butchering scam identifiers elucidated in Mr. Cole's declaration. Ms. Pomeroy transferred approximately $80,000.00 of her assets to the Monex platform at the instruction of an individual she met on Tinder.[24] Her profits appeared to grow rapidly.[25] But when she tried to withdraw her assets, she was told her account had been flagged for "money laundering"—and that she needed to send more money to Monex to "unfreeze" it.[26] To this day, Monex has not returned her assets despite repeated demands.[27] All a perfect match to the archetypical pig-butchering typology.

### D.    Blockchain Tracing Results

As detailed in the Cole affidavit, the assets the Defendants stole from Victim can be traced to accounts they control at the Binance and OKX cryptocurrency exchanges (the "Destination Exchanges"). The tracing methodology is set forth more fully in the Cole affidavit and the attachments

---

[23] Ex. 1-E, Pomeroy Declaration ("Pomeroy Dec.").

[24] *Id.* at ¶¶ 3 – 8.

[25] *Id.*

[26] *Id.*

[27] *Id.*

thereto. The Destination Exchanges and dollar-denominated value of assets traced to them are set forth below.

| Destination Exchange | Amount Traced |
|---|---|
| OKX | $446,071 |
| Binance | $149,527 |

In addition to providing her declaration, Ms. Pomeroy provided Mr. Cole with the records showing her outgoing transactions to Monex. Mr. Cole performed blockchain tracing that revealed the route of these assets and their ultimate destinations. This analysis showed that the assets Ms. Pomeroy sent to Monex ended up at OKX and Binance—just as did the Boardwell Victim's. In fact, approximately $14,000.00 of Ms. Pomeroy's assets were ultimately transferred to the *same Binance account* as those of the Boardwell victim. This tracing confirms both the accuracy of the initial Boardwell tracing and the urgent need for the freezing order Boardwell seeks.

## IV.    Relief Sought

Plaintiff seeks (i) a temporary restraining order freezing the Defendants' accounts at the Destination Exchanges and the assets within them and (ii) an order authorizing expedited discovery. The balance of this Motion will articulate the standards applicable to these requests and explain why Boardwell has satisfied them.

**A.    The Court should issue an *ex parte* Temporary Restraining Order freezing the Defendants' accounts at the Destination Exchanges.**

Plaintiff requests that the Court issue an *ex parte* temporary restraining order freezing the Defendants' accounts at the Destination Exchanges. The standard for issuance of such an order has both procedural and substantive aspects. This section will first explain why Plaintiff has satisfied these requirements. It will then detail the Court's authority to issue an asset-freezing order in this case, and why it should indeed do so.

**1.    *Plaintiff has met the procedural requirements for issuance of an ex parte restraining order.***

The Court has the authority to issue an *ex parte* temporary restraining order without notice or a hearing if (i) "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," and (ii) "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required."[28] Each of these requirements is met here.

*Element 1: Immediate & Irreparable Injury*. The Cole Affidavit shows the likelihood of immediate and irreparable injury or loss. It does so by trenchantly comparing the facts at issue here with the most comprehensive academic study of pig-butchering scams to date. It thereby shows that the

---

[28] FED. R. CIV. P. 65(b)(1)(A)-(B).

Monex enterprise is in fact an archetypical pig-butchering scam.[29] The underlying facts are verified by Mr. Cole's personal review of the evidence provided by Victim and Ms. Pomeroy, several items of which his affidavit attaches in their original forms.[30]

Mr. Cole's affidavit then explains why the risk of immediate and irreparable injury is particularly acute in pig-butchering scam cases. Cybercriminals like the Defendants can and do move crypto assets from address to address in mere seconds, with the click of a button.[31] And while crypto assets held in exchange-based accounts can be frozen and involuntarily disgorged, assets held in "self-custody" or at non-compliant exchanges cannot.[32] Thus, the tracing of Victim's assets to the Destination Exchanges provides a unique and fleeting opportunity to restrain further movement of those assets while Boardwell identifies and serves the Defendants. Courts have repeatedly recognized that these features of blockchain technology justify the issuance of *ex parte* freezing orders in crypto-fraud cases.[33]

---

[29] Cole Aff., ¶¶ 8 – 20.

[30] *Id.*

[31] *Id.* at ¶¶ 25 – 26.

[32] *Id.*

[33] *See, e.g.*, *Harris v. Upwintrade*, 1:24-cv-00313-MJT, Dkt. 7 (E.D. Tex.) (Truncale, J.) (Aug. 8, 2024), at p. 9 (granting TRO in functionally identical pig-butchering case and noting "[i]n light of the speed with which cryptocurrency transactions are made, as well as the potential that the Defendants may further move the assets they are alleged to have stolen, the Court finds that the [Plaintiffs'] request to freeze the exchange accounts to which those assets were transferred is justified, as have other courts considering similar circumstances"); *Cohn v. Popescu*, 1:24-cv-00337-MJT,

*Element 2: Notice.* As required, the Hoda Affidavit certifies in writing the efforts made to give notice and the reasons why it should not be required. That affidavit proceeds from the well-established rule that the Court has the authority to enter an *ex parte* order not only where notice to the adverse party is impracticable, but where "notice to the defendant would render fruitless [the] prosecution of the action."[34] Courts have found that notice of an asset-freeze motion is not required if the parties to be enjoined "are likely to dissipate assets and destroy business documents," such that the very act of providing notice would "cause immediate and irreparable, injury, or damages to [the] Court's ability to award effective final relief."[35] An *ex parte* order is justified under this logic where the movant shows that "the adverse party has

---

Dkt. 8 (E.D. Tex.) (Truncale, J.) (Aug. 30, 2024) (same); *Ohlin v. Defendant 1*, No. 3:23-cv-8856-TKW-HTC, 2023 WL 3676797, at *3 (N.D. Fla. May 26, 2023) ("Considering the speed with which cryptocurrency transactions are made as well as the anonymous nature of those transactions, it is imperative to freeze the Destination Addresses to maintain the status quo to avoid dissipation of the money illegally taken from Plaintiffs."); *Jacobo v. Doe*, No. 1:22-CV-00672DADBAKBAM, 2022 WL 2052637, at *3 (E.D. Cal. June 7, 2022) ("Because it would be a simple matter for [defendant] to transfer [the] cryptocurrency to unidentified recipients outside the traditional banking system and effectively place the assets at issue in this matter beyond the reach of the court, the court finds that plaintiff is likely to suffer immediate and irreparable harm in the absence of injunctive relief.") (cleaned up); *Astrove v. Doe,* No. 1:22-CV-80614-RAR, 2022 WL 2805315, at *3 (S.D. Fla. Apr. 22, 2022) (same).

[34] *Matter of Vuitton et Fils S.A.*, 606 F.2d 1, 5 (2d Cir. 1979).

[35] *Fed. Trade Comm'n v. Dluca*, No. 18-60379-CIV, 2018 WL 1830800, at *2 (S.D. Fla. Feb. 28, 2018), *report and recommendation adopted*, No. 0:18-CV-60379-KMM, 2018 WL 1811904 (S.D. Fla. Mar. 12, 2018).

a history of disposing of evidence or violating court orders *or that persons similar to the adverse party have such a history*."[36]

Mr. Hoda's affidavit avers under penalty of perjury that pig-butchering scammers like the defendants routinely destroy evidence, dissipate assets, and violate court orders. These observations flow from counsel's deep experience in this area. Counsel has personally interviewed approximately 300 victims of pig-butchering scams, and The Hoda Law Firm counts more than 70 of those victims as clients. Counsel has secured numerous freezing orders and orders granting expedited discovery in these cases, from courts around the country, and has personally supervised the implementation of those freezing orders and the discovery process. All of this experience has shown, time and again, that pig-butchering scammers like the Defendants will take *any available opportunity* to destroy evidence, dissipate assets, and violate court orders.

If the Defendants were provided notice of this Motion, they would immediately empty the targeted cryptocurrency exchange accounts. It would be "a simple matter" for them to "transfer [the stolen cryptocurrency] to unidentified recipients outside the traditional banking system, including contacts in foreign countries, and effectively put it beyond the reach of this

---

[36] *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 650 (6th Cir. 1993).

court."[37] Numerous courts have applied just this logic in granting *ex parte* asset-freezing orders in crypto-fraud cases like this one.[38]

> ### 2. Plaintiff has met the substantive requirements for issuance of a temporary restraining order.

To obtain a temporary restraining order, the movant must show: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm if the injunction does not issue, (3) that the threatened injury outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction is in the public interest.[39] Boardwell has met each of these requisites for the reasons set out below.

---

[37] *Jacobo*, 2022 WL 2052637, at *3 (quoting *Dluca*, 2018 WL 1830800, at *2).

[38] *See, e.g.*, *Harris*, Case No. 1:24-cv-00313-MJT, Dkt. 7, at p. 7 (issuing TRO without notice in pig-butchering case where "the thrust of the [Plaintiffs'] allegations is that the Defendants are professional cybercriminals who have every motivation to place their ill-gotten gains beyond the reach of this Court or any other authority … [and they] have provided sufficient evidence to suggest that the Defendants will in fact further dissipate assets if they were given notice of this motion"); *Gaponyuk v. Alferov*, No. 2:23-cv-01317, 2023 WL 4670043, at *2 (E.D. Cal. July 20, 2023) (issuing *ex parte* asset-freeze TRO in similar crypto-fraud case, and writing that "federal district courts have granted *ex parte* relief in situations like this one, noting the risks that cryptocurrencies may rapidly become lost and untraceable"); *Ohlin*, 2023 WL 3676797, at *2 (notice not required where plaintiff offered declarations showing that the defendants were crypto-criminals, which gave the court "every reason to believe the Defendants would further hide those [stolen] assets if they were given notice"); *Jacobo*, 2022 WL 2052637, at *3 (notice not required because plaintiff made credible allegations that defendants were crypto-criminals, which "pose[d] a heightened risk of asset dissipation").

[39] *Moore v. Brown*, 868 F.3d 398, 402-03 (5th Cir. 2017).

*Element 1: The Merits.* Boardwell alleges that the Defendants are liable for (1) violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), (2) conversion, and (3) fraud. Boardwell is likely to succeed on the merits of each of these claims.

*RICO Claim.* To recover on a civil RICO claim, a plaintiff must show (1) a violation of 18 U.S.C. § 1962 (a "RICO violation"), (2) an injury to his business or property, and (3) that such injury was caused by the RICO violation.[40] To prove a RICO violation, a plaintiff must show that the defendant is (1) a person[41] who engaged in (2) a pattern[42] of racketeering activity,[43] (3) connected to the acquisition, establishment, conduct or control of an enterprise.[44]

Boardwell's RICO claim is likely to succeed. The Complaint makes non-conclusory allegations sufficient to establish each element, including by (1)

---

[40] *Lewis v. Danos*, 83 F.4th 948, 956 (5th Cir. 2023).

[41] A RICO "person" is "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961.

[42] A "pattern of racketeering activity requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

[43] "Racketeering activity" includes acts indictable under 18 U.S.C. § 1341 (relating to mail fraud) and § 1343 (relating to wire fraud). 18 U.S.C. § 1961(1)(B).

[44] An enterprise is "a group of persons or entities associating together for the common purpose of engaging in a course of conduct." *Whelan v. Winchester Prod. Co.*, 319 F.3d 225, 229 (5th Cir. 2003) (defining enterprise and recounting elements).

identifying and defining the Defendants' enterprise,[45] (2) explaining their pattern of wire fraud,[46] and (3) recounting the injuries suffered as a direct result of the Defendants' racketeering scheme.[47] The Complaint shows that the Defendants' scheme was the very definition of an enterprise created solely to perpetrate a pattern of wire fraud, and on a global scale.[48] At least one court has issued a default judgment approving a civil RICO claim in a crypto-fraud case functionally identical to this one.[49]

*Conversion Claim*. To prevail on a conversion claim, a plaintiff must show that: "(1) the plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property."[50]

---

[45] Complaint, *passim*.

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] Order on Motion for Final Default Judgment, *Sun v. Defendant 1*, No. 1:23-cv-21855 (S.D. Fla. Dec. 8, 2023), pp. 3-4 ("The allegations in Plaintiff's Amended Complaint, admitted by default, establish each element of a RICO § 1962(c) violation. Specifically, Plaintiff alleges that Defendant and her co-conspirators operate a sophisticated global internet cryptocurrency fraud and conversion scheme …").

[50] *Scott Pelley P.C. v. Wynne*, No. 05-15-01560-CV, 2017 WL 3699823, at *11 (Tex. App.—Dallas Aug. 28, 2017, pet. denied).

Boardwell's conversion claim is likely to succeed. The Complaint and the Cole Affidavit show that the Defendants acted intentionally, that their scheme was wrongful, and that they took control of Victim's assets and have not returned them.[51] Numerous courts have found that plaintiffs were likely to succeed on conversion claims in in crypto-fraud cases.[52]

*Fraud Claim.* To prevail on a fraud claim, a claimant must prove: (1) the defendant misrepresented a material fact; (2) the defendant knew the representation was false; (3) the claimant did not know the representation was false; (4) the defendant made the misrepresentation intending that the claimant act on it; and (5) damages resulted from the claimant's reliance.[53]

Boardwell's fraud claim is likely to succeed. The Complaint shows that that the Defendants intentionally and falsely represented that Victim was trading cryptocurrency on a legitimate platform with the intention of causing Victim to transfer her assets to the Defendants' control, that these statements

---

[51] Complaint.

[52] *See, e.g.*, *Bullock v. Doe*, No. 23-CV-3041 CJW-KEM, 2023 WL 9503380, at *5 (N.D. Iowa Nov. 3, 2023) ("Because the claim underlying this request [for an asset-freeze TRO] is mainly conversion—i.e., defendants have plaintiff's property wrongfully—plaintiff's likelihood of success on the merits of this claim suffice for this factor to weigh in favor of plaintiff and the Court need not discuss the further causes of action."); *Yogaratnam v. Dubois*, No. CV 24-393, 2024 WL 758387, at *4 (E.D. La. Feb. 23, 2024) ("It appears from the record that Defendants have no right to claim either possession or ownership of the stolen assets, and Defendants' taking of the funds is clearly inconsistent with Plaintiff's rights of ownership.").

[53] *Las Palmas Med. Ctr. v. Moore*, 349 S.W.3d 57, 67 (Tex. App.—El Paso 2010, pet. denied).

were material to her, and that she acted on the Defendants' misrepresentations to her detriment.[54]

*Element 2: Irreparable Harm*. This irreparable-harm requirement is satisfied for the same reasons explained in Section IV(A)(1), above. As noted there, courts have repeatedly found a risk of irreparable harm in crypto-scam cases like this one.[55]

*Element 3: Balancing*. The threatened injury to Victim outweighs any damage a freezing order might cause to the Defendants. Victim has lost a life-changing sum, and the order she seeks is the only hope of preserving some assets for recovery. And while an asset freeze might cause temporary inconvenience to the Defendants, any restraint implemented can be undone should future developments require.[56]

*Element 4: Public Interest*. A freezing order will serve the public interest because it will "dissuade would-be fraudsters from stealing, laundering illegal proceeds, and preying on Americans" like Victim.[57] It will

---

[54] Complaint, ¶¶ 14-19.

[55] *See* n.38, *supra* (collecting cases).

[56] *See, e.g.*, *Licht*, 2023 WL 4504585, *3 (balancing factor weighed in plaintiff's favor because alleged crypto-thieves faced only "inconvenience" of asset-freeze, which could be undone); *Gaponyuk*, 2023 WL 4670043, at *3 (same, finding "a short-term freeze is unlikely to present any great harms"); *Jacobo*, 2022 WL 2052637, at *6 (same, finding "[a] delay in defendant's ability to transfer the [allegedly stolen] assets only minimally prejudices defendant, whereas withholding injunctive relief would severely prejudice plaintiff by providing defendant time to transfer the allegedly purloined assets into other accounts beyond the reach of this court").

[57] *Licht*, 2023 WL 4504584, at *3.

also "prevent the Defendants from profiting from their scheme, ensuring they lack resources and incentives to perpetrate similar schemes in the future,"[58] and "provide[] assurance to the public that courts will take action to promote … recovery of stolen assets when they can be readily located and traced to specific locations."[59]

    3.    *The Court has the authority to issue the asset-freezing injunction Plaintiff seeks.*

    Typically, a court may issue an order freezing a defendant's assets only after a plaintiff's claims have been brought to judgment.[60] This rule does not apply, however, where the plaintiff seeks equitable relief and a constructive trust over traceable stolen assets.[61] Plaintiff seeks just such relief here.[62] For that reason, the Court has the authority to issue the requested asset-freezing injunction.

---

[58] *Id.*

[59] *Jacobo*, 2022 WL 2052637, at *6 (quoting *Heissenberg*, 2021 WL 8154531, at *2); *see also, e.g.*, *Gaponyuk*, 2023 WL 4670043, at *3 (finding that asset freeze would "serve the public's interest in stopping, investigating, and remedying frauds").

[60] *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 322 (1999).

[61] *See, e.g.*, *Yogaratnam v. Dubois*, No. CV 24-393, 2024 WL 758387, at *3 (E.D. La. Feb. 23, 2024) (issuing asset-freeze TRO in crypto-fraud case, noting that "numerous district courts … have issued a TRO in this exact circumstance to freeze a cryptocurrency asset," and collecting cases); *Jacobo*, 2022 WL 2052637, at *3 (issuing asset-freezing TRO where plaintiff sought constructive trust over allegedly stolen assets); *Gaponyuk*, 2023 WL 4670043, at *2 (same).

[62] Complaint, ¶ 34.

*4.    The Court should not require a bond.*

Rule 65(c) provides that a court issuing a preliminary injunction or TRO should do so "only if the movant give security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."[63] Yet, "[c]ourts retain extensive discretion to set the amount of a bond required as a condition for issuing a preliminary injunction and may, in fact, elect to require no bond at all."[64] The Defendants will not suffer any damages as a result of the requested asset freeze, which—as explained above—can be undone at any time if the Defendants choose to appear and challenge the injunction. Boardwell thus requests that the Court decline to impose a bond.

**B.    The Court should authorize Plaintiff to issue subpoenas seeking information about information about the Defendants and their activities.**

Typically, parties may not seek "discovery from any source before the conference required by Rule 26(f)."[65] But expedited discovery before a Rule 26(f) conference is permitted where "authorized … by court order."[66] Courts in this circuit apply a "good cause" standard to determine whether such an

---

[63] Fed. R. Civ. P. 65(c).

[64] *Astrove*, 2022 WL 2805345, at *5 (declining to require bond in crypto-theft case); *Jacobo*, 2022 WL 2052637, at *6 (same).

[65] Fed. R. Civ. P. 26(d)(1).

[66] *Id.*

order should issue.[67] Good cause may be found where "the need for expedited discovery in consideration of the administration of justice, outweighs the prejudice to the responding party."[68]

Many courts have authorized expedited discovery from cryptocurrency exchanges in cryptocurrency-related fraud cases like this one.[69] Indeed, courts have affirmatively held that any privacy interests that alleged cybercriminals have concerning the discovery of information about their identities and activities is outweighed by the need to adjudicate victims' claims against them.[70]

### 1.    *Proposed Discovery*

Boardwell's proposed discovery arises from the pre-suit investigation performed by its investigator. This investigation revealed a series of third

---

[67] *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 239 (S.D. Tex. 2011) (applying good cause standard).

[68] *Id.* at 239.

[69] *See, e.g., Strivelli v. Doe*, No. 22-cv-22060 2022 WL 1082638, at *2 (D.N.J. Apr. 11, 2022) (authorizing expedited discovery from cryptocurrency exchanges in crypto case and noting "the Court's review of cryptocurrency theft cases reveals that courts often grant motions for expedited discovery to ascertain the identity of John Doe defendants"); *Licht*, 2023 WL 4504585, at *4 (issuing broad authorization for expedited discovery in functionally identical crypto-fraud case and requiring that "any party served with a request for production shall produce all requested items within 72 hours of the request").

[70] *Gaponyuk*, 2023 WL 4670043, at *4 (finding alleged cybercriminals' privacy interests were "outweighed by the need to adjudicate the [victim's] claims," and holding that "privacy concerns shall not be a just cause for [a] subpoenaed non-party to withhold [] requested documents and information").

parties likely to be in possession of information about the Defendants. Each of those third parties and their connection to this case is set out below.

| Subpoena Target | Connection to Case |
|---|---|
| Cloudflare, Inc. | Cloudflare provided content-delivery-network services to monexaba.vip. |
| Gname | Gname is the domain registrar for monexaba.vip. They may have information about the individual accountholders. |
| OKX Group | A significant portion of the cryptocurrency assets stolen from Victim were ultimately deposited in accounts at the OKX cryptocurrency exchange. |
| Binance, Ltd. | A significant portion of the cryptocurrency assets stolen from Victim were ultimately deposited in accounts at the Binance cryptocurrency exchange. |
| WhatsApp, Inc. | WhatsApp is the messaging service that Wilson used to communicate with Victim. |
| Coinbase | Wilson provided Victim with a Coinbase deposit address. |

2. *Information Sought*

Plaintiff requests the Court's authorization to issue subpoenas to the above-listed entities and other entities likely to be in possession of information about the Defendants, seeking the following information concerning the Defendants' accounts:

- Biographical and contact information;
- IP address and device logs;
- Payments information,[71] and;

---

[71] As to payments information, the proposed subpoenas will seek only information sufficient to identify the payments provider and the salient account with that provider.

- Account balances and activity.

In pig-butchering cases like this one, the discovery process resembles peeling the layers of an onion. Internet service providers' subpoena responses frequently reveal information warranting additional subpoenas to other internet service providers. For example, a subpoena to Google concerning a Gmail address that the alleged scammers used to communicate with the plaintiff will reveal a Microsoft email address used as the "recovery email" for that account. For that reason, Boardwell seeks the Court's authorization to issue follow-on subpoenas seeking the same scope of information outlined above to additional internet-service providers and cryptocurrency exchanges determined to be in possession of relevant information.[72]

## V.    Conclusion

For the reasons set out above, Boardwell has met the standards for issuance of a temporary restraining order and an order authorizing expedited discovery in this matter. Boardwell requests that the Court issue this relief in the form of the proposed order submitted with this Motion.

---

[72] *See Licht*, 2023 WL 4504585, at *4 (authorizing expedited discovery on "any party" likely to have information about the defendants).

- 24 -

Dated:  August 7, 2025                    Respectfully submitted,

                                          THE HODA LAW FIRM, PLLC

                                          _____

                                          Marshal J. Hoda, Esq.
                                          Tx. Bar No. 2411009
                                          3120 Southwest Fwy. Ste. 101
                                          PMB 51811
                                          Houston, TX 77098
                                          o. (832) 838-0036
                                          marshal@thehodalawfirm.com


                                          Patrick Yarborough, Esq.
                                          Tx. Bar No. 24084129
                                          440 Louisiana, Ste. 1800
                                          Houston, TX 77002
                                          o. (713) 331-5254
                                          patrick@fosteryarborough.com

                                          *Attorneys for Plaintiff*